**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | |
| **Plaintiff,** | |
| **v.** | **1:09-cv-1965-WSD** |
| **MORGAN KEEGAN & COMPANY, INC.,** | |
| **Defendant.** | |

## OPINION AND ORDER

This matter is before the Court on Defendant Morgan Keegan & Company, Inc.'s Motion for Summary Judgment [40].

## I.   BACKGROUND

Morgan Keegan & Company, Inc. ("Morgan Keegan" or "Defendant") is a Memphis, Tennessee investment firm with over 1,200 brokers and 300 offices throughout the southeast.  The firm offers financial products and services to its customers, including securities brokerage, asset management, financial planning, mutual funds, securities underwriting, sales and trading, and investment advice.

Morgan Keegan's underwriting and sale of auction rate securities ("ARS") is at the center of this action.

ARS are long-date municipal bonds, corporate bonds, and preferred stock with variable dividend yields or interest rates that are re-set every seven, fourteen, twenty-eight, or thirty-five days.  (Pl's Stmt. of Facts No. 1; Def's Stmt. of Facts No. 4.)  The interest rate (or dividend) for a particular ARS issue is set through a "Dutch auction," in which investors purchase and sell ARS at par value (typically $25,000 per share).  (Pl's Stmt. of Facts No. 2; Def's Stmt. of Facts No. 3.)  In advance of an auction, potential ARS investors submit bids (or "buy orders") to the managing broker-dealer (typically the underwriter of the ARS), specifying the number of ARS shares they desire to purchase and the minimum interest rate they will accept.  (Id. No. 4.)  Existing ARS holders can submit "sell orders" to sell a specified quantity at a certain interest rate, or "hold orders" to hold a specified quantity.  (Id.)

An auction succeeds, or "clears," if investors submit enough buy orders to cover the sale orders.  (Id. No. 5.)  In a successful auction, the "clearing rate" is the lowest interest rate that will cover all buy orders.  (Id.)  The clearing rate applies to all buy orders that investors accept, regardless of whether a bidder actually specified a lower rate in the bid.  (Id.)  If bidders do not submit sufficient buy

2

orders to purchase all of the shares offered for sale, the auction fails and the

interest rate resets to the "maximum rate" until the next auction, and all of the

current holders continue to hold the securities, with minor exceptions.  (Id. No. 6.)

ARS underwriters historically prevented auctions from failing by placing

"supporting" bids to purchase for their own accounts the excess ARS offered for

sale.  (Id. No 7.)  The underwriter would then typically hold these ARS in its own

inventory.  (Id.)  In its role as an underwriter, Morgan Keegan submitted orders in

auctions for its own account, either as a bidder or a seller.  (Def's Resp. to Pl's

Stmt. of Facts No. 9.)[1]

### *ARS Market Collapse*

Before 2007, ARS auctions rarely failed.  (Id. at No. 10.)  Beginning in the

second half of 2007, however, ARS auction failures began to occur.  (Def's Stmt.

of Facts No. 46.)  In early February 2008, auctions began to fail at increasing rates,

restricting the ability of investors to liquidate ARS they held.  (Pl's Resp. to Def's

Stmt. of Facts No. 12.)  By February 12, 2008, there were approximately 100

failures in auctions in which Morgan Keegan played some participating role.  (Pl's

Stmt. of Facts No. 25.)  By that time, most ARS underwriters other than Morgan

---

[1] The SEC contends that Morgan Keegan did so to ensure that the auctions
"cleared" and to prevent failed auctions.  (Pl's Stmt. of Facts No. 9.)

Keegan stopped supporting auction success by placing bids for their own accounts, resulting in an enlarged number of auction failures.  (Id. at No. 24.)

During the ARS collapse, Morgan Keegan continued to buy ARS for its account to support auctions, thus providing ARS liquidity for its customers.  As a result, Morgan Keegan's ARS inventory increased from $54 million on February 8, 2008, to $133 million on February 15, 2008, to $179 million on February 21, 2008. (Def's Resp. to Pl's Stmt. of Facts Nos. 26 and 27.)  On February 27, 2008, Morgan Keegan elected to cap its ARS inventory at between $182-185 million. (Id. No. 27.)  After Morgan Keegan reached its ARS inventory cap, it discontinued its purchase of ARS for its account.  Without Morgan' Keegan's support, those auctions failed and Defendant's customers were left holding approximately $2.2 billion of ARS, including $1.1 billion of ARS underwritten by Morgan Keegan. (Pl's Stmt. of Facts No. 28.)

### Morgan Keegan's Written Disclosures

Defendant prepared several written disclosures for its customers warning of the risks associated with ARS.  These "Written Disclosures" included: (1) a twenty-four (24) page description of its ARS practices and procedures (the "ARS Manual"); (2) a trade confirmation after each ARS transaction ("Trade

Confirmation"); (3) a tri-fold brochure (the "ARS Brochure"); and (4) an ARS web page on its website.[2]

The ARS Manual[3] tracked the best practices set forth by the Securities Industry Financial Markets Association (Def's Ex. 32 at 32; Def's Ex. 3 ¶ 4). Morgan Keegan posted the ARS Manual on its website for the benefit of its customers.  (Def's Ex. 32 at 33-34.)  The ARS Manual devoted a full page to the risks of auction failures and how auction failures would be handled if they occurred.  The ARS manual specifically warned customers that:

> Holders who have submitted sell orders should be aware that, in the event of an auction failure, they will not be able to sell all, and may not be able to sell any, securities in the auction.

(Def's Ex. 1 at MK0187699-700.)  A section entitled "Risk Factors and Special Considerations" stated:

> Morgan Keegan is permitted, but not obligated, to submit orders in auctions for its own account either as a bidder or a seller, or both, and routinely does so in its sole discretion. . . . Because of these practices, the fact that an auction clears successfully does not mean that an investment in the securities involves no significant liquidity or credit risk.  Morgan Keegan is not obligated to continue to place such bids or encourage other bidders to do so in any particular auction to prevent an

---

[2] The record is not clear on precisely when Morgan Keegan made these Written Disclosures available, but the parties appear to agree that they were largely available during the 2007 and 2008 timeframe.

[3] Morgan Keegan prepared the ARS Manual at the request of the SEC in response to an earlier SEC investigation into the ARS market.  (Def's Ex. 5 at 10, ¶ IV.E).

> auction from failing or clearing at a rate Morgan Keegan
> believes does not reflect the market for the securities. Investors
> should not assume that Morgan Keegan will do so or that
> auction failures will not occur.

(Id. at MK0187704-05.)  Under a section styled "No Assurances Regarding

Auction Outcomes," Morgan Keegan warned:

> Morgan Keegan provides no assurance as to the outcome of any
> auction. Nor does Morgan Keegan provide any assurance that
> any bid will be successful, in whole or in part, or that any
> auction will clear at a rate that a bidder considers acceptable. . . .

(Id. at MK0187706.)  Finally, a section entitled "Holder's Ability to Resell

Auction Rate Securities May be Limited" states:

> In any auction of auction rate securities, holders will be able to
> sell all of their securities for which they submitted a sell order
> only if there are sufficient bids to purchase all those securities
> in the auction. If sufficient bids have not been made, auction
> failure results, and holders that have submitted sell orders will
> not be able to sell in the auction all, and may not be able to sell
> any, of the securities subject to such submitted sell orders. See
> *Auction Failure* above. . . .

> Morgan Keegan may submit a bid in an auction to keep it from
> failing, but it is not obligated to do so. There may not always be
> enough bidders to prevent an auction from failing in the
> absence of Morgan Keegan bidding in the auction for its own
> account or encouraging others to bid. Therefore, auction
> failures are possible, especially if the issuer's credit were to
> deteriorate, if a market disruption were to occur or if, for any
> reason Morgan Keegan were unable or unwilling to bid. . . .

> Your ability to resell any auction rate securities will depend on
> various factors affecting the market for the securities, including

> news relating to the issuer of the securities, the attractiveness of alternative investments, the perceived risk of owning the securities (whether related to credit, liquidity or any other risk), the tax or accounting treatment accorded the securities (including U.S. generally accepted accounting principles as they apply to the accounting treatment of auction rate securities), reactions of market participants to regulatory actions or press reports, financial reporting cycles and market conditions generally. Demand for auction rate securities may change without warning, and declines in demand may be short-lived or continue for longer periods.

(Id. at MK0187706-07; Def's Stmt. of Facts Nos. 21-24.)

Morgan Keegan also issued an annual newsletter to its customers in January 2007 and January 2008 that stated:

> For anyone with an investment in auction rate securities or for anyone interested in investing in auction rate securities, we would direct your attention to the Morgan Keegan Web site for a description of Morgan Keegan's material practices and procedures regarding these auctions. A written description of these material practices and procedures is available upon request. If you have any questions regarding these securities or these procedures, please feel free to contact your financial advisor.

(Def's Ex. 7 at MK0473847; Def's Ex. 8 at MK0473863.)

Customers who purchased ARS also received a Trade Confirmation that directed them to Morgan Keegan's website "[f]or more information regarding the auction procedures."  (Pl's Stmt. of Facts No. 63.)  The Trade Confirmation explained that "[i]f this or any transaction is in error or not in accordance with your

understanding or instructions, please inform our customer service department immediately." (Def's Ex. 9 at MK005402.)  Morgan Keegan gave its ARS customers ten (10) days to reverse any transaction.  (Id.)

The ARS Brochure described Morgan Keegan's ARS products and repeated many of the disclosures and warnings contained in the ARS Manual.  (Def's Ex. 11.)  The ARS Brochure indicated that "ARS provide (but do not guarantee) liquidity at par through 7, 28 and 35 day auctions." (Id. at MK-SEC-47319.)  The ARS Brochure also described the risks associated with ARS, stating:

> Investors should be aware that investing in auction rate securities involves certain risks that differentiate such securities from money market investment instruments.
>
> - **Liquidity Risk** – The ability of an investor to dispose of a share of an auction rate security may be largely dependent on the success of the auction.
>
> There is no assurance that any particular auction will be successful, and neither the issuer nor any broker dealer is obligated to take any action to ensure that an auction will be successful….

(Id. at MK-SEC-47320.)  Morgan Keegan made the ARS Brochure available at all of its office branches and provided it to its brokers or customers upon request. (Def's Ex. 30 at 27-30, 58.)

Morgan Keegan also posted on its website a description of the risks associated with its ARS products.  (Def's Ex. 10.)  The website provided essentially the same information as the ARS Brochure.  (Id. at MK0473414-17.)

### *Morgan Keegan's Sales During the Collapse*

The SEC contends that during the ARS market collapse, Morgan Keegan continued to sell its ARS products and, between January 2 and March 19, 2008, Morgan Keegan sold approximately $647 million of ARS to approximately 1,145 customers.  (Pl's Stmt. of Facts No. 73-75.)  The SEC also contends that Morgan Keegan's brokers misrepresented ARS liquidity risk when attempting to increase sales.  The SEC cites the testimony of four customers who stated that Defendant's brokers misled them regarding the risks associated with ARS.  These four Morgan Keegan clients testified that Morgan Keegan brokers told them that ARS were:

- "as good as cash" (Pl's Ex. 50 at 21, 24, 50);
- "as good as money" (Pl's Ex. 52 at 63);
- "just like money markets and CDs" (Pl's Ex. 51 at 29-30);
- "cash equivalents to CDs and money markets (Pl's Ex. 49 at 19);
- "just as good as" an investment in a CD insured by the "FDIC" (id. at 22);
- "completely liquid" except for "a possible 35-day hold," (id. at 67);
- presented "zero concerns [and] zero risks" (Pl's Ex. 51 at 27, 29-30, 40, 74, 93); and
- involved "absolutely no risk" (Pl's Ex. 52 at 20).

The customers assert that the brokers did not disclose the possibility of an auction failure and the associated liquidity risks.  (Pl's Stmt. of Facts No. 32.) They testified further that some Morgan Keegan brokers claimed that ARS investments did not carry any risk at all.  (<u>Id.</u> No. 33.)  The SEC contends that these four customers did not review any of Morgan Keegan's Written Disclosures warning them of the ARS liquidity risks.  (<u>Id.</u> No. 67.)

On March 20, 2008, weeks after the ARS market collapse, Morgan Keegan instituted an enhanced disclosure policy to warn customers about ARS risks.  (<u>Id.</u> No. 69.)  As part of this policy, Morgan Keegan required its customers to sign a letter stating that:

> I understand that my securities are currently, or have been recently, failing at auction.  I understand that it may be a considerable period of time before liquidity returns to this investment and I view this with a longer term horizon.

(<u>Id.</u>)

### *Procedural History*

On July 21, 2009, the SEC initiated this action against Morgan Keegan.  The Complaint alleges that Morgan Keegan misled investors regarding the risks associated with ARS.  The SEC acknowledges that the investors did not necessarily lose money when the ARS auctions failed, but were unable to liquidate their ARS investments and thus suffered damages in some undisclosed amount.

(Complaint ¶¶ 20, 21.)  The SEC specifically contends that Morgan Keegan violated: (1) Section 17(a)(1) of the Securities Act (Count One); (2) Sections 17(a)(2) and (3) of the Securities Act (Count Two); (3) Section 10(b) of the Exchange Act and Rule 10b-5 (Count Three); and (4) Section 15(c) of the Exchange Act (Count Four).  The SEC seeks both monetary and injunctive relief.

On December 29, 2010, Morgan Keegan moved for summary judgment on the SEC's claims.

## II.   DISCUSSION

### A.   Summary Judgment Standard

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Parties "asserting that a fact cannot be or is genuinely disputed must support that assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c)(1).

The party seeking summary judgment bears the burden of demonstrating the absence of a genuine dispute as to any material fact.  Herzog v. Castle Rock

Entm't, 193 F.3d 1241, 1246 (11th Cir. 1999).  Once the moving party has met this

burden, the non-movant must demonstrate that summary judgment is inappropriate

by designating specific facts showing a genuine issue for trial.  Graham v. State

Farm Mut. Ins. Co., 193 F.3d 1274, 1282 (11th Cir. 1999).  Non-moving parties

"need not present evidence in a form necessary for admission at trial; however,

[they] may not merely rest on [their] pleadings."  Id.

The Court must view all evidence in the light most favorable to the party

opposing the motion and must draw all inferences in favor of the non-movant, but

only "*to the extent supportable by the record*."  Garczynski v. Bradshaw, 573 F.3d

1158, 1165 (11th Cir. 2009) (quoting Scott v. Harris, 550 U.S. 372, 381 n.8

(2007)) (emphasis in original).  "[C]redibility determinations, the weighing of

evidence, and the drawing of inferences from the facts are the function of the

jury . . . ."  Graham, 193 F.3d at 1282.  "If the record presents factual issues, the

court must not decide them; it must deny the motion and proceed to trial."  Herzog,

193 F.3d at 1246.  But, "[w]here the record taken as a whole could not lead a

rational trier of fact to find for the non-moving party," summary judgment for the

moving party is proper.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475

U.S. 574, 587 (1986).

B.    Analysis

The Complaint alleges that Defendant violated sections 10(b) and 15(c)(1)

of the Exchange Act and sections 17(a)(1-3) of the Securities Act.  "To prove a

10(b) violation, the SEC must show (1) material misrepresentations or materially

misleading omissions, (2) in connection with the purchase or sale of securities,

(3) made with scienter."  SEC v. Merch. Capital, LLC, 483 F.3d 747, 766 (11th

Cir. 2007).  The elements of a section 15(c)(1) claim are the same as a section

10(b) claim.  SEC v. George, 426 F.3d 786, 792 (6th Cir. 2005).  "To show a

violation of section 17(a)(1), the SEC must prove (1) material misrepresentations

or materially misleading omissions, (2) in the offer or sale of securities, (3) made

with scienter."  Id.  "Finally, to show that the defendants violated section 17(a)(2)

or 17(a)(3), the SEC need only show (1) material misrepresentations or materially

misleading omissions, (2) in the offer or sale of securities, (3) made with

negligence."  Id.  Defendant only challenges the first element of the Commission's

claims, arguing that it did not make material misrepresentations or omissions to its

ARS customers.

"Materiality is proved by showing a 'substantial likelihood that the

disclosure of the omitted fact would have been viewed by the reasonable investor

as having significantly altered the 'total mix' of information made available.'"

SEC v. Ginsburg, 362 F.3d 1292, 1302 (11th Cir. 2004) (quoting TSC Indus., Inc.

v. Northway, Inc., 426 U.S. 438, 449 (1976)).  The standard depends on the actions

of a hypothetical "reasonable investor" and thus does not consider whether the

customers in this case actually considered the broker's statements about the risks

associated with ARS.[4]  See TSC Indus., 462 U.S. at 449.  "The determination of

materiality 'requires delicate assessments of the inferences a 'reasonable

shareholder' would draw from a given set of facts and the significance of those

inferences to him, and these assessments are peculiarly ones for the trier of fact.'"

Ginsburg, 362 F.3d at 1302.

    The SEC argues that Morgan Keegan's brokers generally orally misstated

the risks associated with ARS to its customers.  The SEC further contends that

Defendant did not do enough to ensure that its customers read the Written

Disclosures and that many customers based their investment decisions entirely

---

[4] Unlike the materiality inquiry, a court must consider the particular circumstances
of the individuals involved to determine whether an investor "reasonably relied" on
a broker's statements.  See Bruschi v. Brown, 876 F.2d 1526, 1529 (11th Cir.
1989) ("Determinations of whether an investor's reliance was justified requires the
consideration of all relevant factors, including:  (1) the sophistication and expertise
of the plaintiff in financial and security matters; (2) the existence of long standing
business or personal relationships between the plaintiff and the defendant; (3) the
plaintiff's access to relevant information; (4) the existence of a fiduciary
relationship owed by the defendant to the plaintiff; (5) concealment of fraud by the
defendant; (6) whether the plaintiff initiated the stock transaction or sought to
expedite the transaction; and (8) [sic] the generality or specificity of the
misrepresentation.").

upon the broker's oral misrepresentations.[5]  Morgan Keegan contends that any

misrepresentations or omissions by its brokers are not material as a matter of law

in light of its extensive Written Disclosures, which detailed the risks associated

with ARS.  It further contends that, on the evidence presented, no rational trier of

fact could find that Morgan Keegan misled its ARS customers.

         1.      Distribution of Written Disclosures

The SEC argues that Morgan Keegan failed to adequately distribute its

Written Disclosures to customers, and, as a result, many customers did not review

the disclosures and did not know of the potential ARS liquidity risks.  The SEC

claims that the four Morgan Keegan customers who were deposed in this action,

and who testified that they were not presented or referred to the ARS sales

literature and its disclosures, create sufficient undisputed facts that Morgan

Keegan's disclosures were inadequate and misleading.

The SEC's argument presupposes that Morgan Keegan and other sellers of

securities have a duty to ensure that each customer is given a copy and reads all

written disclosures that are available to ARS purchasers.  No court has imposed

such a requirement on securities dealers and, not surprisingly, the SEC does not

---

[5] The SEC concedes that Morgan Keegan's Written Disclosures adequately
described the risks associated with ARS, but claims that Morgan Keegan did not
do enough to ensure that its customers received and read these disclosures.

cite any authority for this sweeping proposition.[6]  Indeed, Morgan Keegan's duties were more limited.  Defendant needed to only make a "full and fair disclosure to the public, not to any particular investor."  Dupuy v. Dupuy, 551 F.2d 1005, 1015 (5th Cir. 1977) (comparing the duty to disclose in SEC enforcement proceedings with the duty to disclose in private 10b proceedings).

The facts show that Morgan Keegan made its Written Disclosures available to its customers.  In 2007, pursuant to a directive from the SEC, Morgan Keegan prepared the ARS Manual, which tracked the best practices as set forth by the Securities Industry Financial Markets Association for the securities industry as a whole.  (Def's Stmt. of Facts No. 18.).  Morgan Keegan sent a copy of the ARS Manual to each of its customers who held ARS and posted it on its website so any investor could access it.  (Id.)  Morgan Keegan issued an annual newsletter to its customers in January 2007 and January 2008 that directed ARS customers to the

---

[6] The SEC cites several cases, but none stand for the proposition that a securities dealer must ensure that each customer receives and reads a copy of the written disclosures.  See Werner v. Werner, 267 F.3d 288, 297 (3d Cir. 2001) (holding that a disclosure is inadequate when it buries a fact in a voluminous document or discloses it in a piecemeal fashion); In re Apple Computer Secs. Litig., 886 F.2d 1109, 1114 (9th Cir. 1989) (holding that in a "fraud on the market" case, the defendant's failure to disclose material information could be excused where that information was available to the public through the press); SEC v. Mozilo, No. CV-09-3994-JFW, 2010 WL 3656068 (C.D. Cal. Sept. 16, 2010) (finding a disclosure inadequate when an investor was "required to pore through all prior transcripts of earnings calls, review hundreds of prospectus supplements filed by indirect subsidiaries, or 'connect the dots' in a company's various SEC filings.").

Morgan Keegan website and its ARS Manual.  (Id. No. 19.)  Defendant also

published its ARS Brochure, which disclosed the liquidity risks associated with

ARS.  Morgan Keegan displayed the ARS Brochure at its branch locations and

gave a copy to brokers or customers upon request.  (Id. No. 29.)

Notably, Defendant sent Trade Confirmations to each customer after an ARS

purchase.  (Id. No. 20.)  Aside from identifying the amount of the transaction and

the security purchased, the Trade Confirmations directed customers to Morgan

Keegan's website for information regarding ARS procedures.  (Pl's Resp. to Def's

Stmt. of Facts No. 20.)  The Trade Confirmations stated "[i]f this or any

transaction is in error or not in accordance with your understanding or instructions,

please inform our customer service department immediately."  (Def's Ex. 9 at

MK005402.)  Morgan Keegan gave its ARS customers ten (10) days to reverse

ARS transactions.  That is, if a customer reviewed the ARS Manual on the website,

as referenced in the Trade Confirmation, and concluded that the information

contained in the ARS Manual conflicted with his or her understanding of the ARS

purchase, the customer could simply ask Morgan Keegan to reverse the purchase

within ten days.  (See id.)

The Second Circuit approved a similar reverse-sale provision in Modern

Settings, Inc. v. Prudential-Bache Secs., Inc., as a means of making sufficient

written disclosures to investors.  936 F.2d 640, 645-46 (2d Cir. 1991).  The court in

Modern Settings held that a ten-day written complaint clause in a customer

agreement "insures that unauthorized trading disputes are not relegated to

'swearing contests' between the prober and customer.  For these reasons, broker-

customer agreements requiring written notice of objection within a limited amount

of time after the customer receives confirmation of the transaction generally have

been enforced by courts."  Id.

Morgan Keegan made various efforts to direct its customers to its Written

Disclosures, which adequately described, clearly and efficiently, the risks

associated with ARS.  With the exercise of reasonable diligence, any customer

could find information regarding the risks associated with the ARS products.  See

Thompson v. Smith Barney, Harris Hupham & Co., 709 F.2d 1413, 1419 (11th Cir.

1983) (affirming district court's dismissal of plaintiff's 10b-5 claim because "he

knew of the risks associated with options trading, or, with the exercise of

reasonable diligence, he could have found out about such risks."); Isquith v.

Middle S. Utils., Inc., 847 F.2d 186, 201 (5th Cir. 1988) ("[R]eviewing the context

in which a disclosure appears is an essential part of determining the disclosure's

adequacy.").  The disclosures and their availability were adequate.

2.      The Broker's Statements

The SEC contends that the Written Disclosures were rendered ineffective and inadequate because Morgan Keegan brokers did not adequately direct customers to them.  Morgan Keegan claims the alleged oral misrepresentations are immaterial in light of its Written Disclosures and that this paucity of evidence is not sufficient to raise a question that it misled its ARS customers.  Defendant relies on Acme Propane, Inc. v. Tenexco, Inc., 844 F.2d 1317 (7th Cir. 1988) to support its claim.  In Acme Propane, the plaintiffs alleged that the defendants made oral misrepresentations to them regarding the value of an investment.  Id. at 1321.  The trial court, in granting the defendants' motion to dismiss, found that the oral statements alleged were not material in light of the defendants' sales literature, which accurately described the risks of the investment.  Id. at 1322.  The Seventh Circuit reasoned:

> [T]he securities laws are designed to encourage the complete and careful written presentation of material information.  A seller who fully discloses all material information in writing should be secure in the knowledge that it has done what the law requires.  Just as in the law of contracts a written declaration informing one party of an important fact dominates a contrary oral declaration, so in the law of securities a written disclosure trumps an inconsistent oral statement.  Otherwise even the most careful seller is at risk, for it is easy to claim: "Despite what the written documents say, one of your agents told me something else."  If such a claim of oral inconsistency were enough,

> sellers' risk would be greatly enlarged.  All buyers would have
> to pay a risk premium to cover this extra cost of doing business.

Id.[7]

In Carr v. Cigna Securities, Inc., the Seventh Circuit reiterated its holding in

Acme Propane and held that, as a matter of law, written representations prevail

over oral representations.  95 F.3d 544 (7th Cir. 1996).  Judge Posner explained

that:

> If a literate, competent adult is given a document that in
> readable and comprehensible prose says X (X might be, "this is
> a risky investment"), and the person who hands it to him tells
> him, orally, not-X ("this is a safe investment"), our literate,
> competent adult cannot maintain an action for fraud against the
> issuer of the document.  This principle is necessary to provide
> sellers of goods and services, including investments, with a safe
> harbor against groundless, or at least indeterminate, claims of
> fraud by their customers.  Without such a principle, sellers
> would have no protection against plausible liars and gullible
> jurors . . . If the documents he was given, warning him in
> capitals and bold face that it was a RISKY investment, do not
> preclude the suit, it will simply be his word against the seller's
> concerning the content of an unrecorded conversation.

Id. at 547.

The Ninth Circuit took a different approach in Casella v. Webb, 883 F.2d

805 (9th Cir. 1989).  In Casella, the plaintiff purchased a share in a real estate

---

[7] The court found, however, that the sales literature did not adequately explain the
risks of the investment and remanded the case to consider the plaintiffs' 10b
claims.  Id. at 1325.

partnership from the defendant.  Id. at 806.  The defendant orally represented that the investment was a "sure thing," but he provided a written disclosure explaining the risks of the investment.  Id.  The plaintiff did not read the written disclosures. Id. at 809.  The plaintiff asserted a claim under section 12(2) of the Securities Act of 1933[8] after the investment failed.  Id. at 806.  The district court granted summary judgment, concluding that (1) the oral misrepresentation that the investment was a "sure thing" was not a material misrepresentation of fact but mere puffery, and (2) the plaintiff had constructive knowledge of the risks because the defendant disclosed them in writing.  Id.

The Ninth Circuit first considered whether the oral representation that the investment was a "sure thing" was actionable under Section 12(2).  The court rejected the defendant's argument that no reasonable person would find such a statement material and concluded that:

> Statements made in the course of an oral presentation cannot be considered in isolation, but must be viewed in the context of the total presentation.  What might be innocuous 'puffery' or mere statement of opinion standing alone may be actionable as an integral part of a representation of material fact when used to emphasize and induce reliance upon such a representation.

Id. at 808.  The Court also concluded that because Section 12(2) only requires ignorance of the misstatement, the district court erred in imputing the contents of

---

[8] "Section 12(2) applies to misrepresentations of 'material fact.'"  Id. at 807.

written disclosures to the plaintiff.  Id. at 809.  Notably, the Ninth Circuit did not apply a bright line rule that the written disclosures would, in all cases, prevail over contrary oral statements.

The Eleventh Circuit's decision in Bruschi v. Brown, 876 F.2d 1526 (11th Cir. 1989) provides helpful context.  In Bruschi, the plaintiff purchased an investment on the advice of her broker, the defendant.  Id. at 1527.  The defendant told the plaintiff that the investment was safe and would provide significant tax deductions.  Id.  The defendant also provided the plaintiff with extensive written disclosures, which described the risks of the investment, but the plaintiff did not read them.  Id. at 1582.  After the investment failed, the plaintiff sued the broker under Rule 10b-5.  Id.  The district court granted summary judgment for the broker.  Id.

On appeal, the defendant argued that, as a matter of law, an investor is not justified in relying on oral misrepresentations that conflict with contemporaneous written documents.  Id. at 1529.  The Eleventh Circuit disagreed and stated that it "never held that, regardless of the circumstances, an investor is always precluded from recovering under Rule 10b-5 if the misrepresentation upon which the investor relied were oral and conflict in some way with contemporaneous written representations available to the investor."  Id.  The Eleventh Circuit considered

whether the plaintiff justifiably relied on the oral misrepresentations and concluded that her reliance was not unjustified as a matter of law.  Id. at 1530.

In First Union Discount Brokerage Services, Inc. v. Milos, the Eleventh Circuit addressed this issue in a different context.  997 F.2d 835 (11th Cir. 1993). In First Union, the court concluded that an experienced investor could not justifiably rely on the oral statements of his broker that the investment involved little risk when the investor also signed a written disclosure warning him of the investment risks.  Id. at 846.  The court explained that the particular circumstances in Bruschi warranted "departure from the usual presumption that reliance on an oral representation that a written representation contradicts is not justified."[9]  Id. at 846 n. 22.

---

[9] The Eleventh Circuit explained the factual differences between Bruschi and First Union as follows:

> There [in Bruschi], the document was an offering memorandum; here [in First Union], two written contracts. There, the investor was "unsophisticated and inexperienced in financial matters," . . . here, Mr. Milos is a sophisticated investor. There, the defendant advised the investor not to read the disclosure documents; here, First Union did no such thing. There, the defendant initiated the security purchase; here, the Miloses had full control over their investments. There, some statements in the disclosure "documents confirmed some of the alleged oral misrepresentations," . . . here, the written agreements violently contradict the oral representation. In short, Bruschi's proviso is not apposite.

First Union Discount Brokerage Servs., 997 F.2d at 846 n. 22.

Bruschi and First Union differ from this case because they involved private enforcement actions of Rule 10b-5. In private enforcement actions, the plaintiff needs to show that: "(1) the defendant made a false statement or omission of material fact (2) with scienter (3) upon which the plaintiff justifiably relied (4) that proximately caused the plaintiff's damages." Bruschi, 876 F.2d at 1528. When the SEC brings a 10b-5 claim, it is required only to show that the defendant made a "(1) material misrepresentations or materially misleading omissions, (2) in connection with the purchase or sale of securities, (3) made with scienter." SEC v. Merch. Capital, LLC, 483 F.3d 747, 766 (11th Cir. 2007). Because the present case is an SEC enforcement action, the justifiable reliance factor discussions of Bruschi and First Union do not apply.

Bruschi and First Union are nonetheless helpful because they suggest how to interpret the interplay between oral misrepresentations and contrary written disclosures. It appears that our circuit takes the position that oral misrepresentations that conflict with written disclosures may, in certain circumstances, form the basis of a Rule 10b-5 action.[10] That is, oral

---

[10] The court in Bruschi specifically stated that "[w]e have never held that, regardless of the circumstances, an investor is always precluded from recovering under Rule 10b-5 if the misrepresentations upon which the investor relied were oral and conflict in some way with contemporaneous written representations available to the investor." Bruschi, 876 F.2d at 1529.[10] If those statements were

misrepresentations are not immaterial as a matter of law just because proper
written disclosures existed.

When applied in individual enforcement actions, courts consider both the
truthful and alleged false representations, the sophistication of the investor, and the
character and quality of the oral representations made, to ultimately determine if
reliance on the oral misrepresentations was justified.  Where investors claim their
brokers made misrepresentations to them, the evaluation focuses on the impact of
the alleged misrepresentations on the investors.  When different brokers are
involved with different investors, each evaluation may yield a different conclusion.
The evaluation logically could require the consideration of a jury.

Here, the SEC is attempting to bootstrap the investor-specific impact of the
misrepresentations alleged by four individual investors as a grounds to seek relief
for a whole class of investors without any evidence that the other investors
received similar oral misrepresentations, without any evidence that Morgan
Keegan encouraged or instructed its brokers generally to issue misleading
statements, and without any evidence that other investors had not read the

---

immaterial as a matter of law, then an investor would never be justified in relying
on the oral statement.

disclosures that were made in the variety of ways Morgan Keegan made them.[11]

That is, the SEC urges this Court to infer that the communication to four individual

investors by four brokers is sufficient to create an issue of fact whether all Morgan

Keegan brokers made misrepresentations to their ARS customers.  On the

undisputed evidence here, the Court concludes that the oral statements of four

brokers out of hundreds would not lead a rational jury to believe that Morgan

Keegan, as a whole, misrepresented the risks of ARS investments to its customers.

Put another way, the Court concludes that no reasonable juror could conclude that

these four examples of alleged oral misrepresentations could conceivably "have

been viewed by the reasonable investor as having significantly altered the 'total

mix' of information made available."  Basic Inc. v. Levinson, 485 U.S. 224, 231-

32 (1988).

Beyond the four individuals discussed above, the SEC simply has not

presented any admissible evidence that Morgan Keegan misled other customers.[12]

---

[11] Interestingly, it appears that the website disclosures were not only available to
the four investors cited, but they apparently also were referred to them in their
Trade Confirmations.  The investors apparently chose not to review the disclosures
that were available.  (See Pl's Ex. 49 (Gaskin Dep.) at 22-23 (testifying that
Morgan Keegan provided him a document related to ARS, but that he did not read
it); Pl's Ex. 50 (Turner-Kipp Dep.) at 34, 38 (testifying that she received her ARS
Trade Confirmation but did not read it).)

[12] The SEC contends that Morgan Keegan brokers made similar misrepresentations
to other customers and it offers written complaints from those customers to show

The SEC has not introduced any evidence to show that Morgan Keegan instituted a

company-wide policy encouraging its brokers to misrepresent ARS liquidity risks.

The SEC also has not offered any evidence to show that Morgan Keegan was

aware that its brokers were issuing misleading statements.[13]  The only evidence is

that they received misrepresentations from Morgan Keegan's brokers.  (Pl's Stmt.
of Facts No. 29, 30, 32, 33.)  These statements are inadmissible hearsay not
covered by an exception to the hearsay rule.  Macuba v. Deboer, 193 F.3d 1316,
1322 (11th Cir. 1999) ("[I]nadmissible hearsay 'cannot be considered on a motion
for summary judgment.'").

[13] The SEC points to a February 9, 2008, email from the head of Morgan Keegan's
retail ARS desk, Frank Phillips.  (Pl's Ex. 10.)  In the email, Phillips relays his
concerns regarding the ARS market stating that ARS auction failures:

> have [the] potential to kill consumer confidence and could
> cause a panic  to sell based on fear of losing liquidity.  If this
> scenario of yelling fire in a crowded room plays out, then other
> types of auction rate securities will begin to fail and I fear, will
> show that a lot of brokers have misrepresented [the] product to
> their clients . . . . I know a lot of brokers do not understand the
> product fully and do not know what a failed auction means. If
> the broker doesn't understand what a failed auction is, do you
> think the customer does?  Unfortunately, I don't thinks so . . . I
> hope I'm wrong but in my mind this has potential to adversely
> affect the desk . . . .

(Id. at MK007280-81.)  The Court reads Phillips' statement as an assessment
of the general conditions of the ARS market and that, in his opinion, Morgan
Keegan needed to do more to ensure that its brokers and customers
understood the risks associated with ARS.  Contrary to the SEC's
contention, the Phillips email does not indicate that Morgan Keegan knew its
brokers were misrepresenting the liquidity risks of ARS.  Phillips indicates
only that he fears that misrepresentations might have been made, but the
email is not clear on whether he is referring to Morgan Keegan brokers or
the ARS industry as a whole.  The email also indicates that Phillips was only
offering an opinion, an opinion he hoped was wrong.

27

that four out of the thousands of customers[14] who purchased ARS during the

downturn were told that ARS carried little to no risk of illiquidity.

The Supreme Court's materiality standard announced in <u>Basic</u>, works well

when (a) a securities dealer makes a misrepresentation to an individual and the

individual brings a private action against the dealer, and (b) when a dealer makes a

misrepresentation to the public, such as through a press release, and the SEC brings

an enforcement action on behalf of the public.  In the former example, the

individual investor can introduce evidence to show that the misrepresentation was

material to him.  In the latter example, each investor would have received the same

misrepresentation and the SEC could present evidence to show that

misrepresentation was material in light of any contrary information made available

to the public.  This case does not fall under either of the situations discussed above.

Instead, we have a hybrid case where the SEC claims that Morgan Keegan misled

the public through the oral statements made to four individuals.  The SEC must do

more than show a few isolated instances of alleged broker misconduct to obtain the

relief it seeks.[15]  This is especially and essentially true because, in SEC

---

[14] Between January 2 and March 18, 2008, alone, Morgan Keegan sold ARS to
over 1,145 customers.  (Pl's Stmt. of Facts Nos. 73-75.)

[15] The SEC seeks an order requiring Morgan Keegan to repurchase all ARS that it
sold prior to March 20, 2008.  (Compl. at 25.)

enforcement actions, the SEC does not have to show that investors relied on the alleged misrepresentations.

In First Union, the Eleventh Circuit cited approvingly of the Seventh Circuit's decision in Acme Propane.  997 F.2d at 846 n. 22.  This signals the Eleventh Circuit's willingness to require the SEC to show an institutional effort to mislead.  Where, like here, a small number of investors claim they were misled through private communications, they may seek recovery in individual actions. Such a result is consistent with the purpose of SEC enforcement actions—to protect the public as opposed to individual investors.  SEC v. Aaron, 605 F.2d 612, 621 (2d Cir. 1979), rev'd on other grounds, 446 U.S. 680 (1980) ("In view of the policy considerations underlying the securities act [SEC enforcement actions] are brought for the purpose of providing maximum protection for the investing public, as contrasted with the purpose of private damage actions which are brought to obtain monetary relief for individual investors."); SEC v. Tambone, 550 F.3d 106, 153 (1st Cir. 2008) ("SEC enforcement actions have no reliance requirement because they are meant to protect the public generally.") (Selya, J., Dissenting); Schellenbach v. SEC, 989 F.2d 907, 913 (7th Cir. 1993) ("Securities regulations are designed to protect the general public."); SEC v. Rind, 991 F.2d 1486, 1491

(9th Cir. 1993) ("The entire purpose and thrust of a [SEC] enforcement action is to expeditiously safeguard the public interest by enjoining securities violations.").

On the facts of this case, the statements made to the four Morgan Keegan customers cannot, by themselves, alter the total mix of information available to the public where the total mix clearly and repeatedly stated that ARS products have liquidity risks.

### 3.   Morgan Keegan's Market Predictions

Morgan Keegan contends that its failure to predict the ARS market seizure and failure to give its customers more strident warning than it did, sooner than it did, does not amount to securities fraud.  (Def's Br. [40.1] at 19.)  The SEC conceded in its opposition that such conduct does not amount to securities fraud, but is "relevant when evaluating the intent behind Morgan Keegan's stubborn refusal to modify its policies to require brokers to describe the liquidity risks inherent in ARS."  (Pl's Opposition [43] at 24 n. 6.)  The Court agrees that the failure to predict the market does not amount to securities fraud.  Novak v. Kasaks, 216 F.3d 300, 309 (2d Cir. 2000) ("[C]orporate officials need not be clairvoyant; they are only responsible for revealing those material facts reasonably available to them.  Thus, allegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a

claim for securities fraud.").  The Court therefore grants Morgan Keegan's motion for summary judgment that its failure to predict the market does not constitute securities fraud.

**III.   CONCLUSION**

For the foregoing reasons,

**IT IS HEREBY ORDERED** that Morgan and Keegan Company, Inc.'s Motion for Summary Judgment [40] is **GRANTED**.


**SO ORDERED** this 28th day of June, 2011.


WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE